*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
July 18, 2024

Plaintiff-Appellee,

v

No. 358748
Genesee Circuit Court

KEITH DEVON TURNER,

LC No. 19-045042-FC

Defendant-Appellant.

Before: MALDONADO, P.J., and K. F. KELLY and REDFORD, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of first-degree murder, MCL 750.316(1)(a), assault with intent to commit murder (AWIM), MCL 750.83, felon in possession of a firearm (felon-in-possession), MCL 750.224f, carrying a concealed weapon (CCW), MCL 750.227, and three counts of possession of a firearm during the commission of a felony (felony-firearm), third offense, MCL 750.227b. The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to life imprisonment for the first-degree murder conviction and concurrent prison terms of 480 to 720 months for the assault with intent to commit murder conviction and 120 to 240 months each for the felon-in-possession and CCW convictions, to be served consecutively to concurrent prison terms of 10 years each for the felony-firearm convictions. We affirm.

## I. BACKGROUND

Defendant's convictions arise from a shooting that occurred in the parking lot of a nightclub in Flint during the early morning hours of November 23, 2018, that resulted in Anthony Watson's death. Watson, the victim, went to the club with Suave Jackson. Michael Mitchell, who knew Watson, also happened to be at the club. A fight broke out in the club, and Mitchell was kicked out. Watson and Jackson left the club and got into Watson's car when Mitchell saw Watson get into the car as well. Jackson and Mitchell, who did not know each other, argued and then got out of the car to fight. Watson got out of the car to break up the fight. Defendant was at the club

-1-

with his friend, Dyneisha Simmon, and his girlfriend, Tequila Robinson, and the three of them were in the parking lot when Jackson and Mitchell were fighting.

After the fight broke up, Watson started to drive away with Jackson in the front passenger seat. The evidence regarding what happened next is unclear. Robinson testified that she heard gunshots and saw a gun in defendant's hand shortly after someone, presumably Watson, nearly struck them with a car. Mitchell testified that defendant came to check on him after the fight. Defendant then began speaking with Watson, and Mitchell then heard several gunshots. Finally, Murjan Flowers, a security guard at the club, described defendant standing quietly near Watson's car before taking out a gun and firing several shots. Watson was able to drive off and attempted to go to the hospital, but he eventually lost consciousness and crashed. Police responded to the crash and performed CPR on Watson, but he was declared dead at the scene.

There was evidence suggesting that defendant fled the Flint area after the shooting. Simmons, who was tried jointly with defendant on accessory-after-the-fact charges, rented a car for defendant. Defendant, who cut off his braided hair following the shooting, initially went to the Detroit area before he drove to his mother's house in Texas. Defendant was arrested when he returned to the Flint area in early December 2018. The jury found defendant guilty as charged, but was unable to reach a verdict with respect to Simmons, who later pleaded guilty to lying to a police officer.

This appeal followed.

## II. ISSUES RAISED BY APPOINTED APPELLATE COUNSEL

### A. SPEEDY TRIAL

Defendant first argues that the trial court erred by denying his motion to dismiss for violation of his constitutional right to a speedy trial. We disagree.

Whether a defendant was denied his constitutional right to a speedy trial is a mixed question of fact and constitutional law. *People v Gilmore*, 222 Mich App 442, 459; 564 NW2d 158 (1997). This Court reviews constitutional questions of law de novo. *Id.*; see also *People v Rivera*, 301 Mich App 188, 193; 835 NW2d 464 (2013). The trial court's factual findings are reviewed for clear error. *People v Williams*, 475 Mich 245, 250; 716 NW2d 208 (2006); *Gilmore*, 222 Mich App at 459.

A defendant's right to a speedy trial is guaranteed by both the federal and state constitutions, US Const, Am VI; Const 1963, art 1, § 20. See also MCL 768.1; MCR 6.004(A). "The time for judging whether the right to a speedy trial has been violated runs from the date of the defendant's arrest." *Williams*, 475 Mich at 261. "[A] defendant's right to a speedy trial is not violated after a fixed number of days." *Id*. Rather, a court is required to balance the following factors: "(1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) the prejudice to the defendant." *Id*. at 261-262. Regarding the fourth factor, "[f]ollowing a delay of eighteen months or more, prejudice is presumed, and the burden shifts to the prosecution to show that there was no injury." *Id*. at 262.

## 1.  LENGTH OF DELAY

Defendant was arrested in December 2018 and his trial did not begin until July 2021.  Thus, the length of the delay in this case was approximately 31 months.  Defendant was detained without bond during this period.  The parties agree that because the delay is more than 18 months, prejudice is presumed, and the prosecution must show that defendant was not prejudiced.

The parties disagree on who was responsible for the delay.  We agree with defendant that most of the delay before April 2020 was either not explained or justified.  The record indicates, however, that defendant was scheduled to be tried in April 2020, and the parties were prepared for trial by that date.  Had the trial been conducted when originally scheduled, the delay would have been approximately 16 months.  However, the onset of the COVID-19 pandemic in March 2020 prevented defendant's trial from being conducted as scheduled.  In March 2020, the Governor declared a state of emergency and the Supreme Court, in response, issued Administrative Order No. 2020-1, 505 Mich xcix (AO 2020-1) and adopted emergency procedures in the state's court facilities.  Effective March 18, 2020, the Supreme Court imposed limits on trial court proceedings, limiting access to courtrooms to no more than 10 people.  Administrative Order No. 2020-2, 505 Mich cii (AO 2020-2).  Beginning April 23, 2020, the Supreme Court delayed all jury trials until June 22, 2020, or until further order of the Court.  See Administrative Order No. 2020-10, 505 Mich cxxxix (AO 2020-10).  The parties agree that, because of the COVID-19 pandemic, jury trials were not allowed to fully resume in Genesee County until June 2021.  Defendant's trial began approximately a month later.

Regarding the delay before April 2020, "[a]lthough delays inherent in the court system, e.g., docket congestion, 'are technically attributable to the prosecution, they are given a neutral tint and are assigned only minimal weight in determining whether a defendant was denied a speedy trial.' " *Gilmore*, 222 Mich App at 460.  Accordingly, the first 16 months are attributed to the prosecution with a neutral tint.  The entirety of the delay after April 2020 until the start of defendant's trial in July 2021 is attributable to the COVID-19 pandemic.  This Court recently held "delays caused by the COVID-19 pandemic are not attributable to the prosecution for purposes of a speedy-trial claim,"  describing such delays as "neither unexplained nor inexcusable." *People v Smith*, ___ Mich App ___; ___ NW3d ___ (2024) (Docket No. 362114); slip op at 5.  Accordingly, we reject defendant's argument that the delay related to the pandemic should be counted against the prosecution.

In sum, the first ~16 months are attributed to the prosecution but with a neutral tint while the remaining ~15 months are attributed to neither party.  Therefore, on balance, this factor does not support defendant's speedy-trial claim.

## 2.  ASSERTION OF RIGHT

Although defendant asserted his right to a speedy trial, he did not formally do so until March 2021, more than two years after his arrest.  By the time of defendant's speedy trial demand, jury trials still were not permitted in Genesee County.  However, defendant's case was given priority, and his trial began approximately one month after the court was again permitted to conduct jury trials.  Defendant argues that he also asserted his speedy trial right multiple times before the March 2021 motion to dismiss.  However, none of the instances cited were formal

demands on the record for a speedy trial. It is well established "in this State that formal, record entered, demand is required to invoke the constitutional guaranty." *People v Duncan*, 373 Mich 650, 656; 130 NW2d 385 (1964).[1] Defendant argues that he asserted his speedy trial right by moving for dismissal or a personal bond at a February 15, 2019 district court hearing. A request for bond is not a formal assertion of the right to a speedy trial. Defendant cites *Maples v Stegall*, 427 F3d 1020, 1027 (CA 6, 2005), for the proposition that a defendant asserts the right to a speedy trial by seeking bond, but this Court is not bound by decisions of lower federal courts. *People v Woodward*, 321 Mich App 377, 385 n 2; 909 NW2d 299 (2017). Defendant cites no Michigan authority suggesting that requesting bond is also a formal assertion of the right to a speedy trial, and a prior panel of this Court expressly rejected the defendant's invitation to adopt *Maples*. See *People v Sykes*, unpublished per curiam opinion of the Court of Appeals, issued February 28, 2019 (Docket No. 338439), remanded for recon on other grounds ___ Mich ___ (2023), p 4.[2] Defendant cites three additional pretrial hearings that likewise do not contain formal requests for a speedy trial. On July 8, 2019, defense counsel informed the court that he was ready for trial; On September 23, 2019, defense counsel again requested pretrial release, and on July 21, 2020, defense counsel stated that he and his client were "asking to have [the trial] as quick as we possibly can."

Because defendant did not formally assert the right until approximately 27 months after his arrest, this factor does not support his speedy-trial claim.

### 3. PREJUDICE

Regarding the last factor, the record does not support defendant's claims that he was prejudiced by the delay. There are two types of prejudice: prejudice to the person and prejudice to the defense. *Williams*, 475 Mich at 264. Prejudice to the "person would take the form of oppressive pretrial incarceration leading to anxiety and concern." *People v Collins*, 388 Mich 680, 694; 202 NW2d 769 (1972). However, "[e]very incarceration results in a degree of prejudice to the person." *Id.* Prejudice to the defense is the more serious concern when assessing the harm caused by a delay, and a defendant might be able to withstand a longer delay if the impact is personal only. *Williams*, 475 Mich at 264. Prejudice to the defense might take the form of key witnesses no longer being available. *Collins*, 388 Mich at 694.

With regard to prejudice to the person, defendant stresses the anxiety and concern resulting from the lengthy pretrial detention. In particular, defendant notes that (1) he was incarcerated when his girlfriend was shot and miscarried their baby, (2) defendant was wearing "an antisuicide

---

[1] Notably, we could deem this argument waived because defense counsel has failed to provide citations to the record. See MCR 7.212(C)(7) ("Facts stated must be supported by specific page references to the transcript, the pleadings, or other document or paper filed with the trial court."). Defense counsel has not even provided dates for three of the hearings referenced, referring to them instead as "the first circuit court hearing," "the following hearing," and "[t]he next hearing."

[2] See also *People v Pool*, unpublished per curiam opinion of the Court of Appeals, issued April 20, 2023 (Docket No. 358547), p 4 (stating that a request for bond is not a formal demand for a speedy trial). Unpublished opinions of this Court are not binding, but may be considered for their persuasive value. *People v Kloosterman*, 296 Mich App 636, 641 n 2; 823 NW2d 134 (2012).

suit" every time he was visited in jail by his defense attorney, (3) defendant was diagnosed with depression and post-traumatic stress disorder (PTSD) in August 2019, (4) multiple emergencies were declared at the Genesee County Jail due to overcrowding, and (5) defendant's asthma put him at heightened risk of serious illness due to COVID-19. These assertions have little support in the record. Indeed, defendant had an opportunity to raise these arguments and offer factual support when he brought the motion in the trial court. However, he instead raises the arguments now without any evidentiary support. At an October 2019 hearing, defense counsel made a reference to defendant wearing a "bam bam suit," but nothing in the record suggests that this was the case every time defendant was visited in jail. Defense counsel made references at multiple hearings to defendant being depressed, but he has cited nothing in the record suggesting a formal diagnosis of depression or with any references to PTSD. Further, there is likewise nothing in the record regarding emergencies declared at the Genesee County Jail. Defendant's asthma is documented in the record, and while intuition strongly suggests that this increased his risk level as it relates to COVID-19, there is nothing in the record suggesting the extent of defendant's susceptibility. Finally, defense counsel did note at a hearing that defendant lost a child, but this would have caused immense grief regardless of whether he was incarcerated. Nevertheless, it cannot be reasonably disputed that defendant suffered personal prejudice as a result of his lengthy pretrial detention, "particularly considering the risk of exposure to COVID-19 in jails and prisons." *Smith*, ___ Mich App at ___; slip op at 6. However, "anxiety alone cannot establish a speedy-trial violation." *Id*. What is more important "is that the delay did not create any identifiable prejudice to the defense." *Id*.

"Prejudice to the defense is the more serious concern, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Williams*, 475 Mich at 264 (quotation marks and citation omitted). Defendant has not established this form of prejudice. Defendant identifies two witnesses whom he asserts were no longer able to testify favorably for the defense because of the delay in trying this case.

First, defendant asserts that, after the offense, Robinson suffered a gunshot wound to her head that caused cognitive impairments that affected her testimony at trial. Although Robinson mentioned at trial that she had been shot, she did not provide any details about the shooting or how it affected her. The record does not establish when she was shot, and the record does not establish a causal link between the gunshot wound and her memory. Robinson also admitted at trial that she had mental illnesses, including depression and bipolar disorder, which were conditions that she had before the shooting, and she stated that she was not taking her medication at the time of trial. There is no record evidence that Robinson's gunshot injury affected her ability to recall facts or testify as a witness at trial.

Second, defendant argues that he was prejudiced because Akeen Brown, a potential witness, died before defendant's trial. However, Brown died in April 2019, which was the same month as defendant's preliminary examination and approximately four months after defendant's arrest. Accordingly, Brown's inability to testify was not the result of the delay. Moreover, although Brown was identified as a person who was present at the club on the night of the shooting, defendant does not explain what information Brown could have provided or how his testimony would have helped.

Finally, defendant asserts that the delay affected Jackson's memory of the events. In the immediate aftermath of the crash, Jackson told Detective Sergeant Donny Scott that the shooter was the same person with whom he had fought. However, Jackson testified at trial that he did not see who fired the gun, and he firmly denied having ever told the police that the shooter was the person he fought. Defendant's suggestion that the delay caused Jackson to forget is wholly without support. First, when asked if he remembered saying that Mitchell was the shooter, Jackson responded definitively that he never said this. Second, there is nothing in the record suggesting that the delay is what caused Jackson to testify at trial that he did not see the shooter. Indeed, there is no evidence that Jackson ever said anything following the immediate aftermath of the crash that might suggest Mitchell was the shooter. Therefore, this argument is without merit.

On balance, defendant has failed to establish a violation of his speedy-trial rights.

## B. PEREMPTORY CHALLENGES

Defendants arguments regarding the number of peremptory challenges and the order in which they should be exercised were rendered moot by the manner in which jury selection unfolded. Therefore, we decline to address the merits.

We do not address issues that are moot. *People v Thue*, 336 Mich App 35, 39; 969 NW2d 346 (2021). An issue is moot when it presents "nothing but abstract questions of law which do not rest upon existing facts or rights." *People v Richmond*, 486 Mich 29, 35; 782 NW2d 187 (2010) (quotation marks and citation omitted).

In this case, based on its interpretation of MCR 6.412(E)(1),[3] the court afforded 20 peremptory challenges to the prosecution and 10 to each co-defendant. Ultimately, the prosecution only exercised six, and each codefendant exercised nine. Defendant argues that he was actually entitled to 12 peremptory challenges, but because he only exercised nine, he essentially poses a hypothetical question. Therefore, we decline to address the merits.

---

[3] MCR 6.412(E) provides:

> Challenges by Right. Each defendant is entitled to 5 peremptory challenges unless an offense charged is punishable by life imprisonment, in which case a defendant being tried alone is entitled to 12 peremptory challenges, 2 defendants being tried jointly are each entitled to 10 peremptory challenges, 3 defendants being tried jointly are each entitled to 9 peremptory challenges, 4 defendants being tried jointly are each entitled to 8 peremptory challenges, and 5 or more defendants being tried jointly are each entitled to 7 peremptory challenges. The prosecutor is entitled to the same number of peremptory challenges as a defendant being tried alone, or, in the case of jointly tried defendants, the total number of peremptory challenges to which all the defendants are entitled.

Defendant also takes issue with the order in which the peremptory challenges were exercised. The trial court, based on its interpretation of MCR 2.511(F)(3)(a), required the prosecution to exercise a peremptory challenge, followed by defendant, followed by Simmons. Because the prosecution had 20 challenges whereas each defendant had 10, there was a chance that each defendant could be out of challenges while the prosecution had 10 more. However, this did not happen. The prosecution only exercised six challenges, and each defendant had a challenge remaining when they decided that they were content with the composition of the jury. Therefore, this is another hypothetical claim of error that we decline to address.

## C. PUBLIC TRIAL

Defendant argues that the trial court violated his right to a public trial when it closed the courtroom during closing arguments. We disagree because the record does not support defendant's claim that the courtroom was actually closed.

Because defendant did not object to the alleged closure at trial, this issue is unpreserved. *People v Davis*, 509 Mich 52, 64-65; 983 NW2d 325 (2022). Therefore, it is reviewed for plain error affecting defendant's substantial rights, but because closure of a courtroom involves a structural error, there are special considerations relevant to the analysis if defendant is able to demonstrate a plain error. *Id.* at 67-68. A plain error occurs if three requirements are "met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights. The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999) (citation omitted). Even if the three requirements are met, "[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id.* at 763 (quotation marks, citation, and alteration omitted).

On the sixth day of trial, after the jury had been excused for the day, the trial court notified the parties how it intended to proceed with closing arguments when trial resumed the following Monday, which was anticipated to be a busy day on the court's docket, stating:

> All right. And I don't know if I—I think I asked Mr. Ellis anything else for the record so we're going to go into recess. We'll see everybody Monday morning at 8:30. I do have a lot of other things on the docket that morning but we're going to go right into closing arguments and instructions and the litigants for those other cases are either just going to have to wait or—I'm going to have them wait out in the hallway so they're not coming in and out during argument and creating a disruption so—but anybody related to this case that wants to obviously be in here and watch the argument you're welcome to do that. But I will say that once you're in here to watch the arguments, you're in here to watch the arguments, there is no in and out so that it's not distracting to the lawyers and jury. All right, everybody have a good weekend. We'll see you Monday morning.

The following Monday, just before closing arguments, the trial court stated:

All right. We will then get the jury up and begin the argument and we've posted a notice on the door there for—we have other cases scheduled, we've asked people not to come in and to check-in with the office while the arguments are going on so that we're not distracting the jury and/or the attorneys. So we will take a pause here and get the jury up.

In *People v Vaughn*, 491 Mich 642, 651-653; 821 NW2d 288 (2012), our Supreme Court addressed a defendant's right to a public trial, stating:

The right to a public trial has its roots in our English common law heritage. The Sixth Amendment of the United States Constitution expressly enumerates this right and states that a criminal defendant shall enjoy the right to a public trial." The Sixth Amendment right to a public trial is incorporated to the states by the Due Process Clause of the Fourteenth Amendment. Additionally, article 1, § 20 of the 1963 Michigan Constitution guarantees that a criminal defendant shall have the right to a public trial.

* * *

A defendant's Sixth Amendment right to a public trial is limited, and there are circumstances that allow the closure of a courtroom during any stage of a criminal proceeding, even over a defendant's objection[.] The party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure. If there is a timely assertion of the Sixth Amendment public trial right, the remedy for a violation must be appropriate to the violation, although the defendant should not be required to prove specific prejudice in order to obtain relief. [Quotation marks, citations, and alterations omitted.]

Contrary to what defendant argues, the record does not demonstrate that there was any closure of the courtroom, total or partial. Rather, the record indicates that closing arguments were scheduled to begin in defendant's trial and that the court had "a lot of other things on the docket that morning." Anybody with experience working with a busy circuit court docket knows that it can become hectic, with parties and attorneys going in and out of the courtroom while whispering to one another. In order to minimize such disruptions in defendant's case, the court posted a note on the courtroom door directing litigants in other cases to check in at the court's office. There is no evidence that anyone who wanted to view the proceedings in this case were prohibited from doing so, or that any members of the public complained that they were unable to enter the courtroom. Indeed, the court expressly stated that "anybody related to this case that wants to obviously be in here and watch the argument you're welcome to do that." Because there is no indication that members of the general public were precluded from attending trial, defendant has not shown that his right to a public trial was violated. In essence, the court simply let people know that closing arguments in a murder case, rather than usual docket activities, were being conducted in the courtroom and that people wanting to check-in with court staff would need to do so elsewhere. This does not rise to the level of a partial closure of the courtroom.

-8-

D. INEFFECTIVE ASSISTANCE

Defendant argues that he was denied the effective assistance of counsel for a myriad of reasons. We disagree.

Claims of ineffective assistance of counsel present mixed questions of fact and law. *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018). Factual findings are reviewed for clear error and legal conclusions are reviewed de novo. *Id*. Because the trial court has not conducted an evidentiary hearing, this Court should limit its review to mistakes that are apparent from the record. *People v Riley*, 468 Mich 135, 139; 659 NW2d 611 (2003).

"To prevail on a claim of ineffective assistance, a defendant must, at a minimum, show that (1) counsel's performance was below an objective standard of reasonableness and (2) a reasonable probability exists that the outcome of the proceeding would have been different but for trial counsel's errors." *Head*, 323 Mich App at 539 (quotation marks, citation, and alteration omitted). "[A] reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018). This Court presumes counsel was effective, and defendant carries a heavy burden to overcome this presumption. *Head*, 323 Mich App at 539. "A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 US at 690. This Court then evaluates "whether the trial attorney's acts or omissions were outside the wide range of professionally competent assistance." *People v Green*, 322 Mich App 676, 684; 913 NW2d 385 (2018) (quotation marks and citation omitted).

"This Court does not second-guess counsel on matters of trial strategy, nor does it assess counsel's competence with the benefit of hindsight." *People v Traver*, 328 Mich App 418, 422-423; 937 NW2d 398 (2019). "A failed strategy does not constitute deficient performance." *People v Petri*, 279 Mich App 407, 412; 760 NW2d 882 (2008). However, "a court cannot insulate the review of counsel's performance by calling it trial strategy." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012).

1. ANONYMOUS TIPS

Defendant's argument that defense counsel was ineffective for not objecting to testimony about anonymous tips received by the police that identified defendant as the shooter is without merit.

Sergeant Campbell testified at trial that multiple anonymous tipsters reported that defendant shot the victim then changed his appearance and fled the area. Defense counsel explored this subject on cross-examination, asking Sergeant Campbell if she spoke with the anonymous tipster, which she denied. She also was not aware of the caller's identity. Sergeant Campbell further testified that another source of information might have been a confidential informant who provided information about this case to another officer. On redirect examination by the prosecutor, Sergeant Campbell confirmed that defendant's name was the only one provided to the police as the shooter in this incident. If any other names had been provided, Sergeant Campbell would have also investigated them. Defendant argues that Sergeant Campbell's testimony about anonymous

-9-

individuals identifying defendant as the shooter violated his rights under the Confrontation Clause.[4]

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." US Const, Am VI; see also Const 1963, art 1, § 20. "The right of confrontation [e]nsures that a witness testifies under oath at trial, is available for cross-examination, and allows the jury to observe the demeanor of the witness." *People v Yost*, 278 Mich App 341, 370; 749 NW2d 753 (2008) (quotation marks and citation omitted). In general, the Confrontation Clause bars the use of a witness's testimonial statements if the witness does not testify at trial unless the defendant had a prior opportunity to cross-examine the witness. *Crawford v Washington*, 541 US 36, 59; 124 S Ct 1354, 1369; 158 L Ed 2d 177, 197 (2004).

In *People v Chambers*, 277 Mich App 1, 10-11; 742 NW2d 610 (2007), this Court analyzed a similar situation, stating:

> A statement by a confidential informant to the authorities generally constitutes a testimonial statement. However, the Confrontation Clause does not bar the use of out-of-court testimonial statements for purposes other than establishing the truth of the matter asserted. Thus, a statement offered to show the effect of the out-of-court statement on the hearer does not violate the Confrontation Clause. Specifically, a statement offered to show why police officers acted as they did is not hearsay. [Citations omitted.]

Sergeant Campbell's testimony about the anonymous tips was not offered to prove that defendant was the shooter. Rather was offered to show why the police made defendant the focal point of the investigation. Because the statements were not offered for their truth, they did not implicate the Confrontation Clause. See *Id*.

## 2. PERSONAL OPINION OF GUILT

Defendant's argument that Sergeant Campbell improperly expressed her personal opinion of defendant's guilt is without merit.

During her testimony, Sergeant Campbell explained that the evidence eliminated other people as possible suspects and pointed to defendant as the suspect in this shooting. She conducted additional interviews and, given the totality of the investigation, Sergeant Campbell eventually identified defendant as the sole suspect. She stated that no one else was considered a suspect because "no one indicated that there [was] anyone else out there that had fired a gun that night."

> *Q*. Did you look for anybody else? I mean, did you just set your mind on this—on this suspect—

---

[4] Defendant does not cite the hearsay rules, instead focusing solely on the Confrontation Clause.

*A.* No, sir.

*Q.* —and then—and if you had received information otherwise would you have followed those leads?

*A.* That's correct.

*Q.* Why?

*A.* I don't want to convict an innocent person—

*Q.* Okay.

*A.* —and I do need to establish evidence in order to prosecute a case.

Defendant argues that Sergeant Campbell's testimony was objectionable and inadmissible because it involved her own opinion of defendant's guilt.

Defendant also takes issue with the following comments the prosecutor made during closing arguments:

> You then heard from Detective Sergeant Esther Campbell, the officer in charge of this case. She responded to the scene and she conducted that thorough investigation. She followed as many leads that she possibly could. She left no stone unturned and did the best that she could with what she was given at this scene. Throughout the entire investigation she testified that she did not discover information that implicated any other individuals—any other individuals other than Keith Turner as—as being the shooter in this case. She interviewed anyone who would talk to her. She procured the video, she [seized] the evidence, she executed search warrants, and she conducted those interviews with the individuals who were on scene and the lead always pointed back to Keith Turner.

Defendant argues that this line of argument used Sergeant Campbell's opinion as substantive evidence of defendant's guilt.

It is "the province of the jury to determine issues in a case." *People v Lowrey*, 342 Mich App 99, 109; 993 NW2d 62 (2022) (quotation marks and citation omitted). Therefore, it is well established that "a witness cannot express an opinion on the defendant's guilt or innocence of the charged offense . . . ." *People v Fomby*, 300 Mich App 46, 53; 831 NW2d 887 (2013). However, that did not happen in this case. Sergeant Campbell never testified that she believed defendant was guilty, she explained that she never came upon evidence implicating someone else. This testimony was necessary to dispel defendant's theory that the police locked onto him and never considered other suspects, such as Mitchell. Sergeant Campbell explained that she would have investigated other suspects had she been presented with any information suggesting that somebody else might have been the shooter. Further, Sergeant Campbell's comment that she did not want to convict an innocent person was in response to a question regarding why she would have investigated leads suggesting that another person was the shooter. Testifying to an obvious desire to avoid a wrongful conviction is not equivalent to testifying that she believed defendant is guilty.

-11-

Defendant has not established that Sergeant Campbell's testimony involved an improper opinion of defendant's guilt. Accordingly, defendant has not demonstrated that defense counsel erred by failing to object to this line of questioning.

## 3. INVOCATION OF *MIRANDA* RIGHTS

While Sergeant Campbell inadvertently testified that defendant invoked his *Miranda* rights,[5] defense counsel's decision not to draw attention to the comment by objecting was sound trial strategy.

Defendant takes exception to the following exchange between Sergeant Campbell and the prosecutor:

> *Q.* Okay. And where did that lead you?
>
> *A.* So I didn't locate Michael until I think February. Finally, actually, physically spoke with him and interviewed him. Prior to that, again, we have, what you asked about, the ways to contact. I knew Mr. Turner would be in—was—was to—had an appointment on the 5th of December here back in Flint. I was hoping that he would show up to that and we did conduct some surveillance on him, he did [sic] a warrant out for his arrest, and I asked that he be picked up on that warrant and brought in.
>
> *Q.* Did he speak with you voluntarily?
>
> *A.* At the time of questioning, I advised him of—because he was in custody on the warrant, I advised him of his Miranda rights and at that time he requested a lawyer, he did not speak to me.
>
> *Q.* Okay. Were you—we're talking about Michael Mitchell, correct?
>
> *A.* I'm sorry, no. You said Mr. Turner.
>
> *Q.* I apologize. I'm talking about Michael Mitchell, did you—did he speak with you voluntarily?
>
> *A.* Mr. Mitchell was a different story. Mr. Mitchell, it did take me several months to locate him. I did ultimately get a hold of him on the telephone and requested he voluntarily come into the station for a statement which he did.

It is well-established that a witness cannot comment on a defendant's decision to invoke his *Miranda* rights, so this testimony was plainly inadmissible. See *Jenkins v Anderson*, 447 US 231, 235; 100 S Ct 2124; 65 L Ed2d 86 (1980). Notably, it is clear that the testimony was unintended because the witness was confused by the prosecutor's question, and the prosecutor

---

[5] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

promptly moved her off the topic. At that point, an objection would have done nothing but draw attention to the remark. Sometimes "it is better not to object and draw attention to an improper comment." *People v Unger*, 278 Mich App 210, 242; 749 NW2d 272 (2008) (quotation marks and citation omitted). An objection and a curative instruction would have reiterated to the jury multiple times that defendant decided not to speak with the police, so it was reasonable for defense counsel to simply allow this brief comment to pass without additional attention.[6]

## 4. COMPARISONS TO TYPICAL CASE

Defendant cites several instances in which police witnesses offered purportedly impermissible testimony comparing defendant to an ordinary murder case.[7] These arguments are each without merit.

### a. Reluctance of Witnesses

Defendant complains that defense counsel failed to object to Sergeant Campbell's testimony that many witnesses were too scared to come forward. Sergeant Campbell explained that the police investigation was difficult because no one was forthcoming and none of the people she interviewed at the club were very cooperative. She explained that the lack of cooperation did not surprise her because, in Flint, there are a lot of retaliatory shootings when people speak up and witnesses are not inclined to come forward for fear of the police or being shot in retaliation if they testify. She explained that she took witnesses to the police station to talk so they felt more comfortable. In discussing the tips received about defendant, Sergeant Campbell mentioned that information from confidential informants is kept secure to protect the identity of an informant.

Defendant has failed to put forth a cogent legal theory suggesting that this testimony was inadmissible and he does not cite any relevant Michigan caselaw. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment [of an issue] with little or no citation of supporting authority." *People v Matuszak*, 263 Mich App 42, 59; 687 NW2d 342 (2004). Regardless, we discern no basis upon which to deem this testimony improper. Testimony that witnesses were reluctant to cooperate or come forward was relevant to explain the adequacy and scope of the police investigation. Given that this shooting occurred at a crowded night club, it could easily be confusing to the jury that so few eyewitnesses testified. Accordingly, it made sense for Sergeant Campbell to explain that this is commonplace out of a general fear of retaliation and distrust of the

---

[6] While the testimony was inadmissible, because defendant did not establish an error by failing to object and because defendant did not raise this issue as a claim of plain error, we do not need to examine whether the comment impacted the trial's outcome. However, if we did address this issue, we would find any error to have been harmless because it did not have a reasonable probability to affect the outcome of the trial.

[7] We note that this case does not involve the sort of drug profile evidence that this Court barred when it decided *People v Hubbard*, 209 Mich app 234, 242-243; 530 NW2d 130 (1995).

police. Defendant cites a 1986 case from the Federal Court of Appeals for the Third Circuit[8] and a 1980 case from the Michigan Supreme Court[9] concerning "threat evidence" that are not on point because there was no testimony suggesting that defendant did anything to threaten or intimidate any witnesses. Rather, the testimony pertained to a more general fear among the community of cooperation with the police. Murjan Flowers, who was a security guard at the club on the night of the shooting, testified that he obtained a gun because he feared for his safety after receiving threats, but he did not identify defendant as a source of any threats.

**b. Murder Weapon**

Detective Sergeant Bryce Willoughby testified that it did not surprise him that he did not find the murder weapon when he searched defendant's home because "it is not common in the course of a homicide investigation to actually locate the murder weapon as it is an incredibly incriminating piece of evidence." Sergeant Willoughby explained that he had been working for 26 years and investigated more than 100 homicides, and in his experience, the murder weapon is usually discarded. Again, defendant has failed to put forth a cogent legal basis for the inadmissibility of this testimony. Defendant cites a case from a Florida appellate court in which an armed robbery conviction was reversed because a detective testified that it was normal to never find the gun in such cases. *Neal v Florida*, 50 So3d 96, 97-98 (Fla 4th Dist Ct App, 2010). However, this is nonbinding case that was decided pursuant to Florida statutes and caselaw. Defendant also cites *Taylor v Kentucky*, 436 US 478, 487; 98 S Ct 1930; 56 L Ed2d 468 (1978), but that case is not on point. In *Taylor*, the prosecutor said during closing arguments that "one of the first things *defendants do after they rip someone off*, they get rid of the evidence as fast and as quickly as they can," and the United States Supreme Court took issue with the implication "that all defendants are guilty . . . ." *Id*. In this case, Neither the prosecutor nor Sergeant Willoughby said anything to suggest that everyone charged with a crime is guilty. In this case, the fact that the police did not find the murder weapon when they searched defendant's home could reasonably be perceived as a hole in the prosecution's case. Sergeant Willoughby shored up this hole by explaining that, in his experience, failing to find the weapons is not particularly meaningful to the investigation. Because this testimony was not objectionable, defense counsel was not ineffective.

**c. Discrepancies Among Witness Statements**

Defendant takes exception to the following exchange that occurred during the cross-examination of Sergeant Campbell:

> *Q*. [*Defense counsel*] Okay. And Mr. Flowers earlier testified that after he was back inside the club he heard five to seven shots, did—did you, to your knowledge, look for spent cartridges in other areas around Club 69 like maybe out

---

[8] *United States v Guerrero*, 803 F2d 783 (CA 3, 1986). "While the decisions of lower federal courts and other state courts are not binding on this Court, they may be considered as persuasive authority." *Woodward*, 321 Mich App at 385 n 2.

[9] *People v Shelden*, 407 Mich 539; 287 NW2d 176 (1980).

on Saginaw Street or somewhere in that area? Did you look for spent cartridges in any other area around Club 69?

*A.* So, yes. And when—I—I have been—when I do my investigations that's not uncommon in any way, shape, or form for there to be a discrepancy within a couple of shots. No one hears the first shot and starts counting.

*Q.* That's not—

*A.* I'm just saying. Did I look in the crime scene area—

*Q.* My question was—

*A.* —yes. The answer is yes, we did canvas the scene at Club 69 for any additional casings, yes.

*Q.* My question is did you look anywhere other than where you found these five cartridges? Did you look around the club in other areas to find spent cartridges, is what my question was.

*A.* The answer was, yes, and we did not locate any.

Defense counsel asked a reasonable question regarding the scope and adequacy of the police investigation, and he could not have foreseen that Sergeant Campbell would give an answer that was not responsive to the question. When Sergeant Campbell began to suggest that Flowers might have misheard the number of shots,[10] he quickly redirected Sergeant Campbell to the question that was actually asked. At this point, defense counsel's only recourse would have been to request the court to instruct the jury to disregard. Assuming arguendo that such an instruction would have been granted, it would have served only to draw attention to this brief comment. Accordingly, we discern no error by defense counsel.

**d. Nicknames**

Defendant's argument that defense counsel was ineffective for not objecting to testimony about nicknames. This argument is without merit because the testimony was not objectionable. Flowers and Sergeant Campbell each testified that "Louche" was a nickname by which defendant was known, and Sergeant Campbell multiple times referred to defendant as "Louche" during her testimony. Sergeant Campbell further testified that it was common in investigations for people to go by nicknames and that this sometimes necessitated additional effort to identify people. Defendant argues that the nickname was irrelevant. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. "[I]t is well settled that identity is an element of every offense." *Yost*, 278 Mich App at 356. The evidence was

---

[10] Because this is raised only as ineffective assistance, not plain error, we do not need to address the admissibility of this testimony.

relevant because it pertained to defendant's identity. Defendant argues that the evidence was unfairly prejudicial. He cites the dictionary definition of "louche" and asserts that it means "not reputable or decent," so, according to defendant, this unfairly disparaged defendant to the jury. MRE 403 provides that relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Not only was there no testimony offered to the jury to define "Louche," the probative value of helping identify defendant as the shooter outweighs the risk of a possible negative connotation attached to the nickname. Finally, defendant suggests that the nickname was used as substantive evidence to suggest that defendant fit the profile of a murderer, but this is a mischaracterization of the testimony. Sergeant Campbell's testimony that it was common to encounter nicknames during investigations by no means suggests that murderers usually use nicknames. She merely stated the obvious—nicknames are common.

## 5. NARRATION OF VIDEOS

Defendant's arguments pertaining to Sergeant Campbells narration of security videos and commentary on still images are without merit.

Defendant argues that defense counsel was ineffective for failing to object to Sergeant Campbell's testimony narrating events depicted on video recordings, which included testimony identifying various subjects, including defendant, in the videos. She also testified that, on the basis of her experience as a police officer, it appeared that some of the subjects in the videos were armed because of noticeable gaps in their clothing or the movement of their clothing when they walked. In particular, she testified that Flowers did not appear to be armed because of the movement of his clothing, and Akeen Brown also did not have any noticeable gap or weight apparent in his clothing. She further testified:

> Now, Mr. Mitchell goes out towards their vehicle which is just to the right where that tree sticks up a little bit. And that corner is kind of where you'll see a lot of the rest of—now at 7:14 here, for some reason, [defendant] and Mr. Brown come back towards the front entrance of the door and, again, that noticeable gap in his pants, his pants appear to be a little bit heavier this time as he's walking and he's walking with a little bit different step, a little stiffer leg if you will, back—he kind of stops here behind the building for a second and you'll see him peak around the edge on the camera there right along in line with the building and he turns and he starts walking back. And, again, that noticeable heavy gap you can see in the back right side of his pants.

When defense counsel argued defendant's motion for a directed verdict, he acknowledged that the video recording showed an object in defendant's back pocket, but argued that there was no proof that it was a gun.

Defendant argues that these opinions offered by Sergeant Campbell exceeded the permissible scope of lay opinion testimony. MRE 701 allows opinion testimony from lay witnesses that is "rationally based on the witness's perception" and is "helpful to clearly understanding the witness's testimony or to determining a fact in issue." This Court has "liberally

applied MRE 701 in order to help develop a clearer understanding of facts for the trier of facts." In *People v Oliver*, 170 Mich App 38, 50; 427 NW2d 898 (1988), modified on other grounds 433 Mich 862 (1989).[11] This Court has regularly held it to be appropriate for police officers to rely on their experience when offering opinions regarding how evidence should be interpreted. In *Oliver*, officers were allowed to testify that, based on their experience, they believed dents in a car to be from bullets. *Id*. While not strictly binding, *Oliver* has been cited with approval in more recent published opinions. In *People v Daniel*, 207 Mich App 47, 57; 523 NW2d 830 (1994), the officer saw the defendant running up to cars that pulled in front of his apartment and lean into the window for 10 to 15 seconds. *Oliver* was cited for the proposition that the officer was allowed to opine that the defendant was selling drugs. *Id*. In *People v Thurmond*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 361302); slip op at 8, this Court cited *Oliver* for the proposition that it was permissible for an officer to testify, "based on his personal review," that phone records evidenced human trafficking.

This case cannot be meaningfully distinguished from the above. Sergeant Campbell has experience observing how the weight of guns affects how the clothing sits. She used this experience to form an opinion that was rationally based on her perception of the images. Therefore, the testimony was not objectionable, and defense counsel did not err by declining to object. Defendant also generally argues that all of Sergeant Campbell's testimony explaining the contents of the recordings was improper because it invaded the province of the jury, which could decide on its own what was depicted in the recordings. Again, Sergeant Campbell's opinions were rationally based on her perceptions of the videos. Defendant has not established error.

## 6. TESTIMONY REGARDING GUN

Defendant's argument that defense counsel was ineffective for not objecting to testimony regarding a gun that could not be identified as the weapon used in this offense is without merit.

Detective Sergeant Esther Campbell testified that the police executed a search warrant of defendant's sister's house, which he had been seen leaving, and found a gun. Jessica Welton, who was a firearms and toolmarks examiner at the time of the investigation, testified about the examination of this gun:

> *A*. This report reflects that there was a firearm that was sent to our lab just to check—to compare to the fired cartridge cases to make a determination if the fired cartridge cases were fired from that firearm or not.
>
> *Q*. All right.

---

[11] While decisions issued before November 1990 should be "considered to be precedent and entitled to significantly greater deference than are unpublished cases," this Court is not "strictly required to follow" such decisions. *Woodring v Phoenix Ins Co*, 325 Mich App 108, 114-115; 923 NW2d 607 (2018) (emphasis omitted).

*A.* And I concluded that it was inconclusive so it was not identified to that firearm that was sent in.

*Q.* Okay, when you say that it's inconclusive and not identified to that firearm does that mean that that firearm is excluded as being the firearm used or does it mean you don't know?

*A.* It means that I couldn't tell one way or another. The reason why is wasn't excluded is because it was the same caliber of firearm that would have been able to fire a 9 millimeter Luger cartridge.

Defendant argues that because this gun could not be established as the gun used in the shooting, defense counsel should have sought to exclude it. Defendant fails to make clear the exact grounds upon which the evidence was objectionable, but he seems to suggest both that it was irrelevant and that its probative value was substantially outweighed by the risk of unfair prejudice.

Generally speaking, relevant evidence is admissible and irrelevant evidence is not admissible. MRE 402.[12] Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. While the gun found at defendant's sister's house could not be identified as the one used in the shooting, it also could not be excluded. The fact that defendant had access to a gun that could have been used in the shooting makes it more likely that he was the shooter. Therefore, the evidence is relevant. At the time of trial, MRE 403 provided that relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." While the fact that the gun could not be identified as the one used in the shooting did temper the probative value of this evidence, the fact that defendant had access to a gun that could have been the murder weapon was useful information for the jury. On the other hand, there is no clear source of unfair prejudice. The jury was made aware multiple times that the gun could not be conclusively identified as the murder weapon. Furthermore, defense counsel elicited from Jessica Welton that her analysis resulted in the conclusion that this gun was no more likely to be the murder weapon than any other nine millimeter handgun. We have no reason to believe that this evidence was used to unfairly incriminate defendant beyond its actual weight.

## 7. PHOTOGRAPHS

We agree with defendant that his counsel erred by failing to object to the dozens of photographs of the victim's body that the prosecution admitted. However, there is no reasonable probability that this error affected the outcome of the trial, so reversal is not warranted.

---

[12] The Supreme Court enacted a substantial set of stylistic amendments to the Michigan Rules of Evidence effective January 1, 2024. Because defendant's conviction preceded these amendments, we use the preamendment rules in this opinion.

"Photographs are admissible if substantially necessary or instructive to show material facts or conditions." *People v Hoffman*, 205 Mich App 1, 18; 518 NW2d 817 (1994). "If photographs are otherwise admissible for a proper purpose, they are not rendered inadmissible merely because they vividly portray the details of a gruesome or shocking accident or crime, even though they may tend to arouse the passion or prejudice of the jurors." *Id*.

[P]hotographs that are merely calculated to arouse the sympathies or prejudices of the jury should not be admitted. However, if a photograph is otherwise admissible for a proper purpose, it is not rendered inadmissible merely because it brings vividly to the jurors the details of a gruesome or shocking accident or crime. [*Head*, 323 Mich App at 541.]

Autopsy photographs are relevant when they are "instructive in depicting the nature and extent of the victim's injuries." *People v Flowers*, 222 Mich App 732, 736; 565 NW2d 12 (1997). "Photographs may properly be used to corroborate other evidence and are not excludable simply because they are cumulative of a witness's oral testimony." *People v Gayheart*, 285 Mich App 202, 227; 776 NW2d 330 (2009). The cause and manner of the victim's death were not disputed at trial, but "[i]t is well established in Michigan that all elements of a criminal offense are 'in issue' when a defendant enters a plea of not guilty." *People v Crawford*, 458 Mich 376, 389; 582 NW2d 785 (1998). Defendant does not seem to dispute that the photographs were relevant, instead arguing that they should have been excluded pursuant to MRE 403. "The proper inquiry is always whether the probative value of the photographs is substantially outweighed by unfair prejudice." *People v Mills*, 450 Mich 61, 76; 537 NW2d 909 (1995), mod on other grounds 450 Mich 1212 (1995).

In this case, the prosecution admitted, without objection, dozens of cumulative photographs of the victim's body that had little probative value. Most photographs were taken at the scene of the crash whereas many others were taken during the autopsy. The photographs at the crash were of particularly limited probative value because the victim drove away after he was shot and first responders then removed his body from the car; therefore, these pictures offered nothing with respect to the circumstances of the actual shooting, and they did nothing to suggest that defendant was the shooter. There were several redundant closeup photographs of the victim's face, with blood around his head, that seemed to serve very limited purposes, if any. There were pictures taken from farther back that show his body on the ground and feet up in the car. There were pictures in which his body had been covered, including one in which his hand was sticking out from under the cover. There were some pictures that were closeups of gunshot wounds, but these were cumulative of photographs from the autopsy.

The autopsy photographs had more value than those from the crash scene. They aided the jury's understanding of the medical examiner's testimony and were useful tools to demonstrate the nature and extent of the victim's injuries. However, many of these were redundant, and not all of them were useful for the aforementioned purposes. For example, there were two photographs that simply showed bags over the victim's hands.

It seems highly likely that defense counsel could have obtained substantial restrictions on the number and nature of photographs admitted. With respect to the crash scene, defense counsel likely could have limited the prosecution to two or three photographs showing the jury the state of

the entire scene immediately after the crash. Regarding the autopsy, defense counsel likely could have prevented the prosecution from introducing redundant photographs or photographs that didn't serve an obvious purpose. At minimum, defense counsel had nothing to lose from objecting, and there was no valid strategic reason for letting the photographs be admitted uncontested. Therefore, the first prong of the *Strickland* test is satisfied with respect to the photographs.

Nevertheless, reversal is not warranted because there is not a reasonable probability that the outcome of the trial would have been different had the photographs been excluded. First, while the photographs were graphic and likely inflammatory, nothing about them would inflame the jury toward defendant in particular. Moreover, the court was never going to exclude all of the photographs, so it is unclear whether limiting the number that were admitted would have done much to temper the inflammatory effect. Further, a murder is always an outrageous tragedy, and the photographs, to the extent they were inflammatory, did not provide much in terms of new information. Finally, the prosecution did not rely on the photographs to obtain the conviction. There was significant evidence wholly unrelated, particularly the eyewitness testimony, the security footage in which defendant seemed to be possessing a gun, and the consciousness of guilt evidence. Therefore, this issue does not meet the second prong of the *Strickland* test.

## 8. IMPEACHMENT

Defendant also argues that defense counsel was ineffective for not properly impeaching witnesses or offering text messages and a Facebook posting as substantive evidence.

"Decisions regarding what evidence to present, whether to call witnesses, and how to question witnesses are presumed to be matters of trial strategy." *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008). The cross-examination of witnesses is a matter of trial strategy. *Petri*, 279 Mich App at 413. However, "[c]ounsel may provide ineffective assistance if counsel unreasonably fails to develop the defendant's defenses by adequately impeaching the witnesses against the defendant." *People v Lane*, 308 Mich App 38, 68; 862 NW2d 446 (2014).

### a. Messages

Defendant argues that counsel was ineffective for not properly offering into evidence or utilizing messages that Robinson allegedly sent to defendant on February 9, 2019, and May 2, 2019. The potential exhibits were screenshots, and it is not clear what sort of messaging platform was used—defendant states only that Robinson had "messaged" him. However, based on the screenshots, it appears as though the messages were e-mails.

The first message was sent on February 9, 2019, with the subject line "RE:RE:RE:RE:RE:RE I love you only one 4me," and it said:

O I know all that but I was mad and made seem like you did it even doe I kno u didn't that's why I gotta her lawyer and trying to dance today and not trying to be arguing with u. I love u mad I know what told do with your mom but I really don't remember shit but just no lied said u cause was mad don't even remember people who told me I saw on book that Rambo really did it this shit irrrating [sic] wish I

never fucking went out cause this bs I lied to them said you did it and don't even remember non when ask me was high off zans big getting lawyer

The second message was sent on May 2, 2019, with the subject line "RE:RE: What's up," and it said:

If I didn't say that I was going to get charged I didn't do it to hurt you but I understand we don't have y'all anymore I wouldn't want talk to me either but I'm sorry even had go through this but lawyer said I didn't hurt you because yo people lawyers was never so post [sic] say shit about mental health or me being on meds messed on her behalf but pray get through this I'm already on bs just like nene [sic] nowhere around I was off pills and in liquor but the money on there we have talk no more still put money down there I didn't see you with anything and I was scared certain questions wouldn't let me answer like if I was threading but I understand I'll die before no court date they put a lot pressure on me today was so hurt made do it I wasn't even so post [sic] go first but he was the person in the car not me he one so post [sic] be victim and said didn't see you but idk man

While difficult to decipher, these messages seem to suggest that Robinson lied to the police because she was angry with defendant and because she was afraid of being charged with a crime.

Defendant recalled Robinson as a defense witness at trial. Before defense counsel began to question Robinson about messages exchanged with defendant in 2019, the prosecutor objected because he was only provided with the messages during trial and did not have an opportunity to look into this evidence. The prosecutor stated that he had questions about where the messages came from, who authored them, and who sent them. Defense counsel clarified that he was not seeking to admit the messages, but depending on what the witness said, he would use them to refresh the witness's recollection. The court permitted defense counsel to offer the messages only to refresh Robinson's memory, and there was no ruling allowing for their use as substantive evidence. The court made it clear that because no one was seeking to admit this evidence, it was not going to be published to the jury.

Defendant now argues that defense counsel should have sought to admit the messages as substantive evidence to undermine Robinson's credibility. However, the prosecution argues that the messages were inadmissible because they could not be authenticated. Authentication of evidence is governed by MRE 901, which, at the time of trial, provided in relevant part:

(a) General Provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

(b) Illustrations. By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

(1) Testimony of Witness With Knowledge. Testimony that a matter is what it is claimed to be. . . .

Authenticating evidence "is not a particularly rigorous" burden. *People v Smith*, 336 Mich App 79, 107; 969 NW2d 548 (2021).

The prosecution is correct that the record before us is insufficient to authenticate these messages. Robinson repeatedly denied having any memory of these messages. She at one point admitted to remembering "some of it," but it is not clear what "it" was. However, the record is sufficient to infer that there were other routes that could have been taken to authenticate the evidence. For example, defendant testified in his own defense and, if these messages were sent to him, he could have authenticated it. Defense counsel also could have introduced evidence regarding the e-mail addresses involved and the identities connected to these addresses. In sum, we are not persuaded that defense counsel could not have admitted this evidence.

It is clear from the record that defense counsel had no desire to admit the messages; rather, the only purpose for which they were introduced were to refresh Robinson's memory in order to facilitate impeachment of her testimony. The law dictates that we presume defense counsel had a valid strategic reason for this approach, but what the record is not clear what this reason might be. Simply put, the record before us in not sufficient to review counsel's performance regarding these messages absent a remand for additional factual development. However, we decline to order such a remand because, assuming arguendo that failure to admit these statements was deficient performance, defendant cannot establish the requisite prejudice.

First, clearing the low bar of authentication for the purposes of admissibility does not mean that the jury needs to accept that the evidence is what it purports to be. If the evidence had been otherwise authenticated, Robinson still testified that she had no memory of these messages, and it would not have been difficult for defendant to have fabricated them. Second, Robinson would have clear incentives to tell defendant that she lied and to explain her statements away with purported threats of charges. Defendant had been a romantic partner of Robinson's and there was evidence suggesting that witnesses in these cases had reasons to fear retribution. Third, and more generally, the messages are confusing, and it is not entirely clear what the sender was trying to say. Finally, there was significant, more compelling evidence from other sources suggesting defendant was the shooter. For example, there was evidence from security footage purportedly demonstrating that defendant possessed a gun. Mitchell testified that he heard the gunshots immediately after hearing defendant arguing with the victim, that defendant was standing right in front of the vehicle at the time of the gunshots, and that he saw defendant's arm making gestures consistent with shooting simultaneous with the gunfire. Finally, and most importantly, Flowers described seeing defendant clutching a gun while standing by the victim's car immediately before the gunfire began, and he testified that he saw defendant shooting into the vehicle.

We also note that Robinson's credibility was thoroughly undermined. First, there was testimony regarding her mental wellbeing and state of mind, with Robinson describing herself as being "kind of delusional" that night. Second, Robinson did not claim to see defendant shoot at the victim; rather, she described seeing him fire "warning shots" into the air. Moreover, Robinson denied having seen defendant arguing with the victim or anybody else. Finally, there was evidence that Robinson was placed under tremendous pressure to incriminate Turner in order to avoid facing criminal charges arising from the homicide.

In sum, irrespective of whether defendant can establish deficient performance, he cannot establish a reasonable probability that admitting these messages would have resulted in a different outcome.

**b. Facebook Post**

Defendant also argues that defense counsel should have used a Facebook posting by Jackson, which, according to defendant, was consistent with a statement that Sergeant Scott testified Jackson made just after the crash, whereby Jackson allegedly identified the shooter as the person who fought with Jackson earlier, which would have been Mitchell. The post in question said:

> I miss my mf bro [crying emoji] [people] was on some hoe ass Rob shit n I peeped iont [sic] b just fighting mfs could care less about [people] or losing a fight really they was gone try it it [sic] anyway I told bro mfs not right soon ass [sic] I got eyes on the situation we was in…… I fought for me n bro …… they front man blew it that's y they shot the car up I ain't a fool n mfs not finna play me like one ……I loveu [sic] bro we was locked in with out [people] u and I both know rest up til I catch up from 13 – 30 y'all the new [people] #rip_twizzy Anyhony Ray Watson miss by bro [crying emoji] aye take my pic…….. iight [sic] one more ……..u get it ……….iight [sic] let me see [Ellipses in original.]

No reasonable attorney can be faulted for declining to admit such a confusing and incoherent Facebook post. It is not clear to us how this post exonerates defendant, and it would not have been clear to the jury either. Defense counsel already had Sergeant Scott's testimony that Jackson initially implicated Mitchell through which to pursue this strategy, and there was no need to water the issue down by admitting a confusing Facebook post by a bereaved friend. Therefore, defendant has not established ineffective assistance.

## 9. CUMULATIVE ERROR, REMAND, AND CONCLUSION

Defendant argues that even if a single error by counsel would not warrant a new trial, the cumulative effect of counsel's many errors supports granting him a new trial. "The cumulative effect of several errors can constitute sufficient prejudice to warrant reversal even when any one of the errors alone would not merit reversal, but the cumulative effect of the errors must undermine the confidence in the reliability of the verdict before a new trial is granted." *People v Dobek*, 274 Mich App 58, 106; 732 NW2d 546 (2007). We have identified no more than two errors: not seeking to limit the number of photographs of the victim's body that were admitted and not seeking to admit the messages purportedly sent by Robinson. As discussed in detail in the preceding sections, these errors had minimal impact on the trial. This remains true when these errors are viewed in conjunction. As such, defendant has not established the requisite prejudice.

In conclusion, defendant has not established a valid claim of ineffective assistance of counsel.

## III. ISSUES RAISED IN DEFENDANT'S STANDARD 4 BRIEF

Defendant raises additional issues in a pro se supplemental brief, filed pursuant to Supreme Court Administrative Order No. 2004-6, Standard 4. We conclude that each of these arguments are without merit.

## A. CONFLICT OF INTEREST

Defendant argues that the trial court erred by denying his pretrial request for an evidentiary hearing to investigate a prior conflict of interest by codefendant Simmons's former attorney arising from her dual representation of Simmons and Murjan Flowers. We disagree.

A trial court's decision whether to conduct an evidentiary hearing is reviewed for an abuse of discretion. *Unger*, 278 Mich App at 216-217. An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes. *Id*. at 217.

On the day before trial, defendant filed a motion to disqualify Flowers as a witness or to quash the information due to a prior conflict of interest by codefendant Simmons's former counsel, Tiffany Hughes, who was also appointed to represent Flowers in a separate case involving a weapons charge. Although Hughes had been removed as Simmons's counsel before trial and her representation of Flowers was brief, defendant also requested an evidentiary hearing to investigate the conflict of interest. The trial court denied the motion, stating:

> I've read the motion and listened to the arguments and there is absolutely no law provided with regard to the request for the relief and I'd be happy to have an evidentiary hearing if there was any scintilla of evidence in the motion that might provide a reason for one. Essentially, the motion says that Mr. Turner believes something to be true and we should have an evidentiary hearing. Well, that's why we have trials and that's why you have an effective counsel, Mr. Hayman, to cross-examine the witnesses and determine if there's been any undue influence or coercion with regard to their testimony and Mr. Hayman is well able to do that during a trial in front of a jury which protects your right to a fair trial. So the motion is denied for those reasons and we will proceed with a trial.

The alleged conflict involved another attorney's dual representation of a codefendant and a witness. To the extent that defendant has standing to raise the conflict in his own case, he failed to offer or otherwise demonstrate factual support for his belief that the conflict compromised his own legal representation or prejudiced his ability to receive a fair trial such that an evidentiary hearing was necessary. Defendant's written motion did not explain how any conflict arising from that dual representation compromised defendant's own legal representation. Although defendant suggested on the record at the hearing that Hughes could have shared with Flowers information that Hughes obtained during discovery in this case, the court stated that defendant was free to explore with Flowers on cross-examination at trial whether there were any outside or undue influences that affected his testimony.

Defendant suggests that Flowers's identification of him as the shooter was likely influenced by Hughes's representation and argues that Hughes's conflict of interest was manifested by her conduct at defendant and Simmons's preliminary examination. Among the appendices to defendant's original brief on appeal is a copy of the register of actions in Flowers's CCW case. Flowers was arraigned on that charge on April 16, 2019, and Flowers was interviewed by the police more than four months earlier on December 7, 2018; thus, it is apparent from the record that Flowers gave his initial statement prior to being represented by Hughes. A transcript of Flowers's police interview is also attached to defendant's principal brief. In that interview, Flowers described the shooting and identified defendant as the shooter. He was not sure how many shots defendant fired, but he thought it was at least five or six. Flowers also stated that the victim did not reach for a gun and was just trying to leave. At that time, Sergeant Campbell told Flowers that she was going to talk to the prosecutor about the gun charges and "see what the prosecutor has to say about it and explain the situation," and tell the prosecutor "that you're willing to cooperate with us."

When Flowers testified at the preliminary examination on April 17, 2019, he apparently was represented by Hughes in the separate gun case. However, the substance of his testimony on direct examination by the prosecutor was the same as what he told the police in his interview on December 7, 2018. Flowers identified defendant as the person who fired the shots at the vehicle that was leaving the club. He thought he heard five to seven shots, but he was not certain because he took off running after he heard the first shot. Defendant's attorney cross-examined Flowers about his interview with the police on December 7, 2018, and the transcript indicates that defense counsel had a copy of that interview at that time. Hughes, who was representing Simmons, then cross-examined Flowers, but she stated on the record that defendant's attorney had covered a lot of the questions she intended to ask, so her cross-examination of Flowers was brief. In response to questioning by Hughes, Flowers clarified that he was approximately 10 feet away from the victim's vehicle when defendant fired the shots. Flowers also clarified that he saw one gunshot fired, but he heard five or six more shots as he ran off.

Defendant argues that, because Hughes was also representing Flowers at the time of the preliminary examination, Hughes did not have a motive to impeach Flowers's testimony. Even if true, this only supports an argument that the conflict might have compromised Hughes's representation of codefendant Simmons. Defendant was represented by separate counsel, and there is no basis upon which to conclude that any conflict of interest by Hughes as between Simmons and Flowers impeded defendant's own counsel's representation or motive to impeach Flowers's testimony. Further, defendant has not made an offer of proof regarding how Flowers's testimony would have been different if not for the pretrial conflict of interest. Moreover, it was undisputed that Hughes was no longer representing codefendant Simmons at the time of trial. Thus, the circumstances giving rise to the conflict no longer existed by the time of trial.

Defendant also argues that his right to due process was violated because the prosecution was aware of Hughes's conflict of interest and suppressed it. According to defendant, suppression of the conflict prevented his own counsel from using the conflict for impeachment, thereby prejudicing defendant's right to effective representation. Defendant further argues that the trial judge should have recused himself because he was aware of the conflict before trial and failed to disclose it. The record does not support these arguments. On the contrary, defendant's attorney was clearly aware of the prior conflict because he raised the issue in a pretrial motion. Further, as

the trial court made clear when denying defendant's motion for an evidentiary hearing, counsel was free to explore on cross-examination of Flowers at trial whether any outside influences affected his testimony. Defendant also notes that the judge who presided over his case also presided over Flowers's gun case, but he offers no basis upon which to suspect that this affected the judge's ability to be impartial.

## B. FALSE TESTIMONY

Defendant argues that the prosecutor violated his right to due process by knowingly allowing false testimony to stand uncorrected at trial. The record does not support this claim of error.

Because defendant did not object to any of the alleged improper testimony or otherwise raise this issue in the trial court, this issue is unpreserved. *People v Brown*, 294 Mich App 377, 382; 811 NW2d 531 (2011). We review unpreserved issues for plain error affecting defendant's substantial rights. *Davis*, 509 Mich at 67-68; *Brown*, 294 Mich App at 382.

"It is inconsistent with due process when the prosecution allows false testimony from a state's witness to stand uncorrected." *People v Smith*, 498 Mich 466, 475; 870 NW2d 299 (2015), citing *Napue v Illinois*, 360 US 264, 271-272; 79 S Ct 1173; 3 L Ed 2d 1217 (1959) and *Giglio v United States*, 405 US 150, 153; 92 S Ct 763; 31 L Ed 2d 104 (1972). Accordingly, prosecution "may not knowingly use false evidence, including false testimony, to obtain a tainted conviction." *Smith*, 498 Mich at 475-476 (quotation marks, citation, and alteration omitted). However, a prosecutor need not correct every instance of mistaken or inaccurate testimony, or assume "the role of defense counsel and ferret out ambiguities in his witness's" testimony. *Id*. at 477 (quotation marks and citation omitted). Rather, a prosecutor is required to advise the trial court when the prosecutor knows that a "witness is giving testimony that is substantially misleading." *Id.* (quotation marks and citation omitted). "The defendant has the burden of demonstrating that a witness's testimony was in fact false." *Thurmond*, ___ Mich App at ___; slip op at 10.

### 1. ROBINSON

Defendant argues that Robinson falsely testified that: (1) she and defendant got out of defendant's car and were almost struck by Watson's car while they were crossing the street; (2) that she and defendant stood by the security guards on the driver's side of Watson's vehicle after it almost hit them; and (3) that she saw defendant shoot a gun. Defendant's argument is based entirely on the premise that Robinson's testimony is contradicted by the relevant surveillance footage. However, we have reviewed the pertinent surveillance footage, and it is clear that it did not capture everything that happened. First the security camera is directed toward the club's parking lot, but the fight and the shooting occurred at the adjacent street. Accordingly, the relevant interactions are only visible at the very top of the video and cannot be seen with detail. Moreover, most of what happened is blocked by numerous parked vehicles. In the video, defendant and Robinson can be seen leaving defendant's car and walking in the direction of the fight. However, most of their movements happened behind other vehicles and in a crowd of people. We cannot ascertain if they were almost hit by a car, where they were standing, or who shot the gun. Further, to the extent that the video seems to vary from aspects of Robinson's testimony, she was very open

at trial about the fact that she could not remember that night very well. Therefore, this argument is without merit.

Defendant also relies on messages attributed to Robinson to show that she falsely implicated defendant in the offense in her trial testimony. Defense counsel unsuccessfully attempted to use these messages at trial to refresh Robinson's recollection, and they were discussed at length earlier in this opinion. Even if it can be established that the messages were written by Robinson, they do not prove that the prosecution knowingly allowed false testimony at trial. "Although an inconsistent prior statement may be a mechanism to impeach a witness's credibility at trial, it is not definitive evidence that the trial testimony is false." *People v Bass*, 317 Mich App 241, 275; 893 NW2d 140 (2016). These messages raise issues of credibility, but they do not establish that her trial testimony, rather than the statements in the messages, was false.

Finally, defendant suggests that Robinson's testimony was coerced. Robinson testified that prior to making her first statement, the police drove her to a Rally's fast food restaurant and allowed her to order whatever she wanted. Robinson further testified that she understood that she had been charged with a crime and that the police wanted her to make a statement against defendant. She agreed that her statement could impact whether she was allowed to go home. Further, Sergeant Campbell testified that she told Robinson that Robinson would likely face charges arising from the homicide if she did not make incriminating statements against defendant. Also, defendant again cites the messages Robinson purportedly sent to defendant indicating that she was under intense pressure from the police to make incriminating statements.

These facts raise legitimate questions regarding the credibility of Robinson's testimony, but raising genuine credibility issues is not the same as establishing that the testimony was actually false. It is a common and well-established practice for law enforcement to use threats of criminal charges to pressure witnesses to offer incriminating statements, but this alone is insufficient to establish that the statement was coerced or that its substance was actually false. Importantly, the jury was made fully aware of the pressure that the police applied to Robinson to get her to talk. As noted, Robinson and Sergeant Campbell both testified about the tactics that were used to procure inculpatory statements.

This is a matter of credibility, and the jury was well-equipped to assess for itself whether it believed Robinson's testimony. "[B]ecause defendant has failed to show that the testimony elicited by the prosecution was actually false, he cannot meet his burden of demonstrating that the elicitation of such testimony constituted plain error that affected his substantial rights." *Bass*, 317 Mich App at 272.

## 2. FLOWERS

Defendant also argues that Flowers falsely testified that he saw defendant shoot a gun five to seven times.[13] Defendant again argues that Flowers's testimony was false because the

---

[13] This is not exactly what Flowers said; Flowers testified that he saw defendant fire the gun once, that he ran away, that he heard additional gunshots as he fled, and that he heard a total of "maybe" five to seven shots.

surveillance recordings did not capture defendant possessing, firing, or pointing a gun. However, as detailed above, the surveillance footage did not capture everything that happened, so it does not establish that Flowers's recitation of events was false. Indeed, the actual shooting is not captured by the video. Instead, the video shows the victim's vehicle speed off while numerous people run away. The video neither establishes who shot the gun nor how many shots were fired. Defendant also lays out reasons why Flowers might have an incentive to lie in order to protect himself from criminal prosecution, but again, this is a matter of credibility and does not establish that the testimony was false.

### 3. SERGEANT CAMPBELL

Defendant argues that Sergeant Campbell falsely testified at trial that defendant was arrested on a parole-absconding warrant. Defendant contends that this testimony was false because a copy of the warrant was never produced, despite a request. However, the fact that the warrant was not located or produced is insufficient to prove that defendant was not arrested on a parole-absconding warrant. Moreover, reversal is only warranted "if the tainted evidence is material to the defendant's guilt or punishment," and defendant must establish a "reasonable likelihood that the false testimony could have affected the judgment of the jury." *Bass*, 317 Mich App at 272-273 (quotation marks and citation omitted). Whether defendant was arrested on a parole-absconding warrant has no bearing on his guilt or innocence. The prosecution did use defendant's flight to Texas as consciousness of guilt evidence, but it is undisputed that defendant traveled to Texas in violation of the terms of parole; whether this travel was the technical basis for his initial arrest is immaterial.

Defendant argues that Sergeant Campbell falsely testified that she was not involved with the surveillance of defendant's sister's house prior to his arrest. Defendant relies on the affidavit Campbell prepared for a search warrant in which she allegedly admitted to having been involved with this surveillance. This argument is without merit. Sergeant Campbell stated in the search warrant affidavit that "Fellow Officers," not herself, were involved in the surveillance. Defendant has not demonstrated any inconsistency between this statement and Sergeant Campbell's trial testimony that she was not involved in the surveillance at defendant's sister's house.

Defendant argues that Sergeant Campbell falsely testified that he was the only suspect. In particular, defendant takes exception to the following exchange:

> *Q*. And at any point in all of your investigation was anyone other than [defendant] identified as shooting at the club—at Club 69 on November 23, 2018?
>
> *A*. No. I developed no other suspects, no other possible suspects, no other shooters, *no one indicated that there anyone else [sic] out there that had fired a gun that night.* [Emphasis added.]

Defendant has established that this testimony actually was false. It is undisputed that Jackson initially told Detective Sergeant Donny Scott that the victim was shot by the person with whom he had a fight prior to the shooting, and this person was Mitchell, not defendant. It is likewise undisputed that Sergeant Scott relayed this information to Sergeant Campbell.

While the prosecution breached its duties by failing to correct this false testimony, this error does not warrant reversal because defendant cannot establish that it affected the jury's judgment, *Bass*, 317 Mich App at 272-273, or that it affected the outcome of the proceeding, *Carines*, 460 Mich at 763, because the jury was clearly and repeatedly made aware of Jackson's initial statement. Defense counsel thoroughly and effectively fleshed out this discrepancy when cross-examining Sergeant Scott:

> *Q.* And, if I'm understanding, he told you that the individual that he got in a fight with grabbed a gun, you said out of the vehicle—out of his vehicle?
>
> *A.* So he said that the gentleman that he got in a fight with, he didn't say where exactly he got the—the firearm from.
>
> *Q.* Well, tell me the words he said, if you recall.
>
> *A.* He said he got into an altercation with a guy at Club 69 which is south of downtown, he got into an altercation with a guy there. He said that same guy produced a firearm and reached inside the vehicle and shot Mr. Watson in the vehicle.
>
> *Q.* All right. So he said the same guy that he got into a fight with? Suave Jackson is telling you the same guy that he got into a fight with at Club 69 produced a gun?
>
> *A.* Yes.
>
> *Q.* And fired into the car, is that correct?
>
> *A.* Yes, sir.
>
> *Q.* All right. Did he tell you how many times he shot into the car?
>
> *A.* I don't recall him saying how many times, no, sir.
>
> *Q.* But he clearly told you the guy that he got into a fight with is the one who shot into the car?
>
> *A.* Yes, sir.

Defense counsel returned to the issue during closing arguments, making the following statements:

> Donny Scott was a patrol officer at the time that this incident occurred. He said that he was called to the scene. When he gets out there at the crash scene he sees Suave [Jackson] sitting on the curb. So Suave is just sitting on the curb. He said Suave told him the guy he was fighting reached a gun in the car. [sic] Now, why is that important? Because, again, remember the back window is down. Suave is sitting in the front passenger seat, he's looking back over his left shoulder, he sees

-29-

Mr. Mitchell pointing a gun into the car. . . . Now, Sergeant Campbell and the prosecution have tried to downplay that statement. I think Sergeant Campbell, when she was on the witness stand, said something to the effect that when she saw Suave Jackson he did the best he could to tell her what—what happened. I think she used the term disoriented to try to describe him and you have to ask yourself, why are you using these terms to describe this person who's identifying to the police the shooter? Well, she can't call Sergeant Donny Scott a liar about what he said he was told so the only way to under mind [sic: undermine] that or to minimize that is to say he was disoriented. When we talk about Suave Jackson, he had to be disoriented. . . .

Sergeant Scott said he saw no visible injuries on Suave Jackson. . . which would be an indication, again, that what Suave Jackson is telling him is coherent, is understandable, and he was telling the police who the shooter was. So you have to kind of ask yourself, well, why would Suave come in and—when he's under oath and say, I don't know who the shooter is? Well, I believe it's because there were lots of rumors that were going around, rumors on Facebook, rumors out in the community, that [defendant] committed this offense and I think that Suave Jackson, of course, is concerned about the family and making sure the family gest justice and so somehow he's been convinced that [defendant] was the shooter and so he comes into court and changes his story. . . . Well, he spoke specifically to Sergeant Donny Scott, he told him specifically what happened. He didn't just say I was shot at, he said the guy that we were in a fight with put the gun in the car and shot. That doesn't sound like someone who's disoriented to me, it sounds like somebody who's giving specific information about what happened and what they actually saw.

Simply put, Jackson's initial statement that the person he fought—Mitchell—was the shooter was a *major* point of emphasis in defendant's trial. It was thoroughly fleshed out during Sergeant Scott's cross-examination, and no other issue received more emphasis during defense counsel's closing arguments. Indeed, defense counsel emphasized Sergeant Campbell's and the prosecution's perceived efforts to downplay what Jackson initially said and suggested that the reason for this was that defendant was a "soft target." Sergeant Campbell's brief comment is thoroughly outweighed by the abundance of attention this statement received. The record makes it clear that the jury was well aware of the fact that the first lead presented to police was a firsthand eyewitness statement that Mitchell—not defendant—was the shooter. Knowing this, the jury still found defendant guilty. Therefore, defendant has failed to establish that this error warrants reversal of his conviction.

In sum, reversal is not required because the record does not support defendant's argument that the prosecutor knowingly allowed false or misleading testimony to stand uncorrected at trial.

## C. WITHHOLDING OF EVIDENCE

Defendant argues that the prosecution improperly suppressed evidence. Because defendant did not raise this claim in an appropriate motion or otherwise in the trial court, it is unpreserved. See *People v Burger*, 331 Mich App 504, 516; 953 NW2d 424 (2020). Accordingly, we review

this issue for plain error affecting defendant's substantial rights. *Davis*, 509 Mich at 67-68; *Burger*, 331 Mich App at 516.

A defendant's right to due process under US Const, Am XIV, prohibits the prosecution from suppressing material evidence favorable to the defense. *People v Fox (After Remand)*, 232 Mich App 541, 549; 591 NW2d 384 (1998), citing *Brady v Maryland,* 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963). To prove a *Brady* violation, a defendant must show that "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) viewed in its totality, is material." *People v Chenault*, 495 Mich 142, 155; 845 NW2d 731 (2014). "Evidence is favorable to the defense when it is either exculpatory or impeaching." *Id*. at 150. "The government is held responsible for evidence within its control, even evidence unknown to the prosecution, without regard to the prosecution's good or bad faith." *Id*. (citations omitted).

> To establish materiality, a defendant must show that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. This standard does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. The question is whether, in the absence of the suppressed evidence, the defendant received a fair trial, understood as a trial resulting in a verdict worthy of confidence. In assessing the materiality of the evidence, courts are to consider the suppressed evidence collectively, rather than piecemeal. *Id*. at 436. [*Chenault*, 495 Mich at 150-151 (quotation marks, citations, and alterations omitted).]

The prosecution is obligated to disclose plea agreements, grants of immunity, or other agreements for testimony. MCR 6.201(B)(5); see also *Giglio*, 405 US at 154

## 1. IDENTITIES OF EYEWITNESSES

Defendant first complains that Detective Trooper Stacey Moore failed to disclose the names of individuals whom she interviewed at the scene. Trooper Moore responded to the scene that night and interviewed several people who reported hearing the gunshots without seeing anything. Trooper Moore testified that she took down their names and information but did not ultimately put any of it into a report because "there was nothing to put in a report." Defendant's argument that a police officer's decision not to document names and contact information for every person in the vicinity of the club who heard gunshots constitutes the suppression of material exculpatory evidence is without merit. Defendant asserts, without factual support, that the people Detective Trooper Moore spoke to were standing near defendant at the time of the shooting. He claims that the witnesses and their information, as reported by Detective Trooper Moore, were favorable to the defense because they did not identify defendant as the shooter. According to Detective Trooper Moore, however, the witnesses reported that they did not see anything of significance. In other words, there is no indication that they saw the shooting or had any information regarding the identity of the shooter, whoever it might be, or had any information to eliminate defendant as a suspect. Presenting the jury with a parade of witnesses testifying that they heard gunshots but did not see anything would not have helped the defense. For these reasons, defendant cannot demonstrate plain error with respect to this issue.

## 2. ALLEGED DISCIPLINE AGAINST SERGEANT CAMPBELL

At the time she testified, Sergeant Campbell was still employed by the Flint Police Department as a sergeant, and had been employed there for more than 25 years. Although she was assigned to the detective bureau as a homicide investigator in November 2018, she was working on the nightshift patrol division at the time of trial. Defendant baselessly assumes that Sergeant Campbell must have been demoted for undisclosed reasons involving misconduct or discipline. He claims that the prosecution suppressed material evidence by failing to reveal any information behind Sergeant Campbell's alleged demotion. This argument is based on sheer speculation. Sergeant Campbell continued to hold the rank of sergeant and there could be many explanations, unrelated to misconduct or disciplinary action, for why she was transferred to another division in the police department. Defendant has the burden to establish plain error; with respect to this issue, he has failed to provide any reason to suspect that Sergeant Campbell was subjected to disciplinary measures, and he has failed to provide any reason to suspect that this hypothetical discipline was in any way material to this case. Therefore, defendant has not established plain error.

## 3. CIVIL ACTION AGAINST TROOPER WELTON

Jessica Welton, a firearms and toolmarks examiner for the Michigan State Police in November 2018, testified as an expert regarding her review of the ballistics evidence in this case. Defendant asserts that she was named in a 2009 civil suit alleging the use of excessive force and that the prosecution breached the *Brady* rule by failing to disclose that information. Similar to the argument regarding Sergeant Campbell's alleged demotion, this argument is based on speculation. Defendant assumes that her being named as a defendant means that she must have "dishonored her oath" by engaging in some sort of misconduct. Defendant further assumes that, because she was no longer employed with the state police at the time of trial, she must have been terminated due to the conduct giving rise to the lawsuit brought nearly a decade before the shooting. In addition to this speculation, the fact that Welton was named as a defendant in a lawsuit appears to have been public information, and it is not clear how the prosecution could have suppressed this information. Defendant seems to suggest that *Brady* requires the prosecution to investigate on his behalf and alert him to any possible source of impeachment.

Further, defendant fails to explain how the fact that Welton was named as a defendant in a civil suit brought in 2009, more than nine years before the instant offense, was relevant to Welton's credibility as a witness at his trial. Indeed, according to the prosecutor, the 2009 lawsuit was resolved in favor of Welton. Furthermore, Welton's credibility was not material to a determination of defendant's guilt or innocence. Welton testified that the spent ammunition recovered from Watson's vehicle was of the .38-caliber class. She also testified that those projectiles could have been fired from nine-millimeter shell casings recovered from the scene, but she was unable to confirm that. Although she was able to determine that the five recovered shell casings were fired from the same weapon, she could not confirm that a firearm recovered from a residence that defendant was observed leaving was the firearm used in this shooting. In short, Welton's testimony was not particularly probative of the identity of the shooter, which was the principal issue at defendant's trial. Accordingly, any failure to disclose Welton's involvement in a civil lawsuit initiated 12 years before defendant's trial does not undermine confidence in the outcome of defendant's trial.

## 4. PLEA AGREEMENT WITH FLOWERS

Defendant also claims that the information about Flowers agreement with the prosecution in exchange for his testimony was not disclosed. This claim is wholly unsupported by the record, and pursuant to plain error review, it is defendant's burden to support his arguments. The following testimony was elicited during direct examination of Flowers:

*Q*. Mr. Flowers, later, after the shooting, a few days later, you were arrested, is that correct?

*A*. Yes.

*Q*. And you had a gun on you, is that right?

*A*. Yes.

* * *

*Q*. And you talked to police and the prosecutor's office agreed not to charge you with that gun, is that—is that right?

*A*. Yes.

The matter was then discussed at length during cross-examination. Defense counsel elicited testimony that when Flowers was initially arrested he was told that he was being arrested in connection with the homicide, but then he was ultimately charged with the gun offense. Defendant then pressed Flowers on whether the police threatened him with charges to make a statement and Flowers repeatedly insisted that he could not remember:

*Q*. The police told you that they can make your homicide charge and your gun charge go away, didn't they?

*A*. Not that I remember, no.

*Q*. The also told you that they could charge you in federal court with a five felony, mandatory five years, didn't they?

*A*. I don't remember that, no.

*Q*. You don't remember that?

*A*. No, I don't.

*Q*. The police are telling you that they could make a homicide and a gun charge go away and you don't remember that?

-33-

*A.* I mean, it's almost been three years, I don't remember. If I don't remember, I don't remember, you can't make me remember something I don't remember.

Defense counsel asked about whether the police told Flowers that defendant was in custody and that nobody was standing up for him, and Flowers continued to insist that he remembered nothing. Flowers denied remembering being told that the police could let him go home to be with his children.

Defense counsel then asked Flowers whether the prosecution dropped the gun charge when he implicated defendant:

*Q.* All right. And it's fact—it's then [sic] when you told the detectives what you knew they wanted to hear and that is you implicated [defendant] as the shooter in this case, correct?

*A.* I didn't implicate anyone. I told them what I saw.

\* \* \*

*Q.* If they had not arrested you, you had no intentions of going to the police and talking to them about this incident, did you?

*A.* I can't say that I didn't or if I did.

It seems clear from the record that defense counsel was well aware that Flowers's charges were dismissed because he implicated defendant. At a minimum, it is neither clear nor obvious that defense counsel did not. See *Carines*, 460 Mich at 763 (defining a plain error as one that is "clear or obvious"). The sole evidentiary basis defendant asserts to support this argument is a statement Tiffany Hughes—Flowers's attorney and Simmons's first attorney—made to the Attorney Grievance Commission:

I never represented [defendant]. I did represent Murjan Flowers. Mr. Flowers, [sic] never offered testimony against my client. This is the reason that I agreed to represent Mr. Flowers. Mr. Flowers testified to never knowing my client Ms. Dyneisha Simmons. As part of Mr. Flowers deal, he was to testify at a hearing; he did testify and his case was subsequently dismissed. It was my understanding that the case was not going to trial. However, the case ended up going to trial and I was removed due to a conflict of interest. I fought to stay on the case but was still removed.

If anything, this statement hurts defendant. Hughes indicated that the deal required Flowers to testify "at a hearing" and that his case was dismissed *after* he testified. However, it is undisputed that Flowers's charges were dismissed long before defendant's case went to trial, suggesting that the deal in question was to testify at a different hearing, perhaps the preliminary examination.

Defendant cites no other evidence to support his argument, and he makes no offer of proof. Defendant has not even suggested that his trial attorney might give any sort of statement suggesting

that he did not know about a deal Flowers had with law enforcement. Moreover, defendant has now filed four motions to remand for evidentiary hearings and expand to the record, three of which were filed pro se. However, none of these motions sought to expand the record with respect to this agreement and defense counsel's knowledge thereof. Therefore, defendant has not established entitlement to any sort of relief regarding this argument.

## 5. ANONYMOUS TIPSTER

Defendant argues that the prosecution wrongfully withheld the identities of the tipsters who implicated him. At trial, Sergeant Campbell testified that she followed up on tips about defendant received from anonymous callers, but the identities of the callers were not determined because they were anonymous. When defense counsel further explored this topic on cross-examination, Sergeant Campbell explained that another officer provided tip information that might have originated from a confidential informant used in narcotics investigations. That information might have been documented in a separate report that was an internal police document, not part of this case, and Sergeant Campbell did not have access to that report. Because the record indicates that these individuals were anonymous, and their identities unknown, defendant cannot claim that their identities were suppressed. Further, to the extent there was a suggestion that one of the tips was provided by a confidential informant, "the people are not required to disclose the identity of confidential informants" unless "a defendant demonstrates a possible need for the informant's testimony . . . ." See *People v Henry (After Remand)*, 305 Mich App 127, 156; 854 NW2d 114 (2014). Defendant has wholly failed to demonstrate that his defense would be helped by finding a witness who implicated him.

Defendant also suggests that references to these tipsters was inadmissible hearsay, but this argument is without merit because the statements were not offered as substantive evidence. "An out-of-court statement introduced to show its effect on a listener, as opposed to proving the truth of the matter asserted, does not constitute hearsay under MRE 801(c)." *People v Gaines*, 306 Mich App 289, 306-307; 856 NW2d 222 (2014). Our Supreme Court has explained that a tipster's statement is not hearsay if it "is relevant as 'background' to the police officer's narrative." *People v Wilkins*, 408 Mich 69, 75; 288 NW2d 583 (1980). The purpose of this evidence was to explain why the police chose to make defendant the focal point of their investigation, not to prove defendant's guilt. Therefore, it was not hearsay.

## 6. PAROLE-ABSCONDING WARRANT

Finally, defendant argues that the prosecution violated its discovery duties by failing to turn over the parole-absconding warrant. This argument is without merit for two reasons. First, it is not clear from the record that the prosecution had this warrant, and the prosecution cannot suppress something it does not have. Indeed, as discussed in Section III.B.3, *supra*, defendant also argues in this appeal that the warrant never existed and that Sergeant Campbell's contrary testimony was false. Second, defendant has not presented us with any reason to believe that this warrant would have aided his defense. The *Brady* rule applies to exculpatory and impeachment evidence, but this warrant would only serve to establish that defendant violated the terms of his parole; presenting this to the jury would have served only to undercut him, assuming it would even have been admissible. Therefore, this claim of error is without merit.

D. SUFFICIENCY OF THE EVIDENCE

Defendant argues that the trial court erred by denying his motion for a directed verdict on the charge of first-degree premeditated murder because there was insufficient evidence of premeditation. We disagree.

A directed verdict of acquittal is appropriate only when the prosecution fails to present evidence that is legally sufficient to support a guilty verdict. *People v Chapo*, 283 Mich App 360, 364; 770 NW2d 68 (2009). "When reviewing a trial court's decision on a motion for a directed verdict, this Court reviews the record de novo to determine whether the evidence presented by the prosecutor, viewed in the light most favorable to the prosecutor, could persuade a rational trier of fact that the essential elements of the crime charged were proved beyond a reasonable doubt." *People v Aldrich*, 246 Mich App 101, 122; 631 NW2d 67 (2001). "Circumstantial evidence and reasonable inferences drawn from it may be sufficient to establish the elements of a crime. Minimal circumstantial evidence is | sufficient to prove an actor's state of mind." *People v Fennell*, 260 Mich App 261, 270-271; 677 NW2d 66 (2004). It is the jury's job, not the court's, "to determine questions of fact and assess the credibility of witnesses[.]" *People v Odom*, 276 Mich App 407, 419; 740 NW2d 557 (2007).

For the purposes of this case, first degree murder is defined as a "willful, deliberate, and premeditated killing." MCL 750.316(1)(a). Defendant argues that there was insufficient evidence of premeditation and deliberation. "A murder is committed deliberately if done without adequate provocation—that is to say while undisturbed by hot blood, and it is premeditated if the perpetrator had the opportunity to consider his or her actions for some length of time before completing the murder." *People v Clark*, 330 Mich App 392, 436-437; 948 NW2d 604 (2019). "Premeditation and deliberation require sufficient time to allow the defendant to take a second look." *People v Jackson,* 292 Mich App 583, 588; 808 NW2d 541 (2011) (quotation marks and citation omitted). "Premeditation and deliberation may be inferred from all the facts and circumstances, but the inferences must have support in the record and cannot be arrived at by mere speculation." *People v Plummer,* 229 Mich App 293, 301; 581 NW2d 753 (1998). Factors that may be considered to establish premeditation include "(1) the previous relationship between the defendant and the victim; (2) the defendant's actions before and after the crime; and (3) the circumstances of the killing itself, including the weapon used and the location of the wounds inflicted." *Id*. at 300-301.

A pause between the initial homicidal intent and the ultimate act may, in the appropriate circumstances, be sufficient for premeditation and deliberation. However, the Legislature's use of the words "willful," "deliberate," and "premeditated" in the first-degree murder statute indicates its intent to require as an element of that offense substantially more reflection on and comprehension of the nature of the act than the mere amount of thought necessary to form the intent to kill. As the Supreme Court has stated, "when a homicide occurs during a sudden affray it would be a perversion of terms to apply the term deliberate to any act which is done on a sudden impulse." To speak of premeditation and deliberation being instantaneous, or taking no appreciable time, destroys the statutory distinction between first- and second-degree murder.

When the evidence establishes a fight and then a killing, there must be a showing of a thought process undisturbed by hot blood in order to establish first-degree, premeditated murder. The critical inquiry is not only whether the defendant had the time to premeditate, but also whether he had the capacity to do so. Without such evidence, the sequence of events is as consistent with an unpremeditated killing—following hard on the outset of the argument—as it is with a premeditated killing after an interval during which there was an opportunity for cool-headed reflection. [*Id.* at 301-302 (quotation marks, citations, and alterations omitted).]

The evidence in this case indicated that Watson's death was the culmination of a series of events that essentially began as a bar fight that eventually moved to the parking lot. The evidence supported an inference that defendant did not have a gun when he entered the club because Flowers described patting down the patrons to check for weapons as they entered. In the surveillance video, defendant can be seen returning to his car and reaching into it. Defendant then briefly sat back down into his car before walking toward the scene of the fight immediately before the shooting. A jury could infer that after the fight began, defendant returned to his car to retrieve his gun then returned to the scene of the fight to shoot Watson. Flowers described defendant as standing at the driver's side of Watson's vehicle, and Flowers said he felt as if something was about to happen because of the way defendant was standing there looking at other individuals, with his hand in or near his pocket and clutching a gun. A reasonable jury could view this evidence as a cool-headed contemplation period. Taken together, the evidence supported the elements of premeditation and deliberation.

## IV. CONCLUSION

None of the myriad of issues raised by defendant have established entitlement to appellate relief. Therefore, we affirm.

/s/ Allie Greenleaf Maldonado
/s/ Kirsten Frank Kelly
/s/ James Robert Redford